# United States Bankruptcy Court

# District of Massachusetts

| | |
|---|---|
| _____ ) | |
| In re ) | Chapter 7 |
| ) | Case No.05-45130-HJB |
| TIMOTHY BARTLETT, ) | |
| NANCY A. BARTLETT, ) | |
| ) | |
| Debtors ) | |
| _____ ) | |
| ) | |
| A.J. RINELLA & CO., INC., ) | Adversary Proceeding |
| ) | No. 06-04045 |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| TIMOTHY BARTLETT, ) | |
| NANCY A. BARTLETT, ) | |
| ) | |
| Defendants ) | |
| _____ ) | |

## MEMORANDUM OF DECISION

Before the Court is a motion for summary judgment (the "Summary Judgment

Motion"), filed by Timothy and Nancy Bartlett, the defendants in this adversary proceeding

and the debtors in the main bankruptcy case.  The plaintiff opposes the Summary

Judgment Motion, both asserting the existence of genuine issues of material fact and

rebutting the Debtors' legal arguments.  Resolution of the Summary Judgment Motion

requires the Court to dwell briefly in the more familiar land of contract law before taking a

1

rare peregrination to the world of the Perishable Agricultural Commodities Act, 7 U.S.C. §

499a *et seq.* ("PACA").


I.      FACTS AND TRAVEL OF THE CASE

The Debtors filed their petition under Chapter 7 of the United States Bankruptcy

Code, 11 U.S.C. §§ 101 <u>et seq.</u>, (the "Bankruptcy Code") on August 1, 2005.  Prior to the

bankruptcy case filing, the Debtors operated M. Ferris & Sons ("Ferris"), selling fruits and

vegetables from their place of business in North Adams, Massachusetts.  In December of

2000, Ferris began purchasing fruits and vegetables from the plaintiff, A.J. Rinella & Co.

("Rinella"), a produce supplier located in Albany, New York.

At the inception of the business relationship between Rinella and Ferris, the Debtors,

as Ferris's owners, completed a credit application (the "Credit Application"), sent to them

by Rinella.  The cover letter (the "Cover Letter") accompanying the Credit Application

elucidated certain terms of the proposed credit arrangement, and stated, in relevant part:

> To apply for a credit account, please fill out the enclosed credit application.
> . . .  All accounts are net 21 days.  Any account with a balance over 30 days
> will be C.O.D. only.  Accounts with a balance over 45 days will be stop
> shipment. An account over 60 days will be turned over for collections.

On the second page of the Credit Application, under the heading "Personal Guarantee,"

appeared the following:

> I/We agree that (1) all invoices will be paid according to your stated terms.
> (2) In the event that there is a deliquency [sic] in payment, I/We will pay a late
> payment finance charge which is computed by a "periodic" rate of 1 ½ % per
> month which is an ANNUAL PERCENTAGE RATE OF 18 %. (3) In the event
> of default, I/We will pay all collection costs and attorney's fee of one third of
> the amount due. . . .

> I/We personally guarantee payment in full including all finance charges,

2

collection costs and attorney's fees incurred as specified above, and waive any presentment, demand, protest and any other notice regarding this guarantee of payment.

Directly below this paragraph appears the signature of Nancy Bartlett, dated December 13, 2000.

Thereafter, the parties conducted business up to and through April 13, 2005, as evidenced by invoices detailing the date of each transaction, the types and amounts of fruits and vegetables shipped and the sale price. Each invoice also contained a box marked "Terms," with "21 days" typed into the box. The following language appeared on the bottom of each page of the invoices:

The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by Section 5C of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499 (e)(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

From December 2004 through April 13, 2005, Ferris purchased $63,936.60 worth of produce from Rinella. Between February 16, 2005 and June 6, 2005, Ferris made payments on outstanding invoices in the total amount of $30,249.60, leaving an unpaid balance of $33,687.00. On April 16, 2005, the Debtors informed Rinella, by letter, that Ferris had "closed its doors." On April 18, 2005, Rinella responded with a Notice of Intent to Preserve Trust Benefits (the "Written Notice"), mailed and addressed to Ferris, purporting to preserve trust benefits under PACA for produce sold to Ferris from February 14, 2005 through April 13, 2005. On May 27, 2005, Rinella filed a complaint in the United States District Court for the Northern District of New York, seeking to recover the unpaid amounts and asserting, *inter alia*, its entitlement to the monies as trust assets under PACA.

3

The Debtors then sought relief under the Bankruptcy Code, and Rinella timely commenced the present adversary proceeding asserting that the debt owed to Rinella should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).[1]  Essentially, Rinella alleges that the Debtors are individually liable on the debt as "responsibly connected" to Ferris.  According to Rinella, the Debtors' failure to hold the proceeds from the sale of the purchased produce in trust for Rinella constitutes fraud or defalcation while acting in a fiduciary capacity under § 523(a)(4).  Before adjudication on the merits of this assertion, however, the Debtors filed their Summary Judgment Motion, alleging, *inter alia*, that the complaint cannot stand because Rinella failed to properly preserve its trust benefits under PACA.

Rinella filed an opposition (the "Opposition"), but has not filed a cross-motion for summary judgment.  After a hearing on the Summary Judgment Motion, the matter was taken under advisement, and the parties were given an additional opportunity to file supplemental and responsive briefs.  Thereafter, Rinella filed a supplemental opposition (together with the Opposition, the "Opposition").  The Debtors have not filed a further response.

---

[1] That section of the Bankruptcy Code provides, in relevant part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –

. . .

> > (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

11 U.S.C. § 523(a)(4).

II.    POSITIONS OF THE PARTIES

   A.    **Application of Payments**

Apart from the PACA question, the Debtors argue that summary judgment should be granted in their favor on the grounds that Rinella relies upon incorrect invoices to establish its claim.  According to the Debtors, Rinella erroneously applied the payments made from February 16 through June 6 of 2005 to the invoices outstanding prior to February 13, 2005.  The Debtors argue that the payments made during that time period should have been applied to contemporaneous invoices, and not to the earlier ones.  Thus, say the Debtors, they have paid some or all of the invoices upon which Rinella relies to establish its debt.

Rinella responds by saying first that, even if the payments technically should have applied to later invoices, the remaining amount due would be the same.  In that case, Rinella would need only to amend its complaint to assert a debt owed on the earlier transactions.  More to the point, though, according to Rinella, is that the evidence supports a conclusion directly contrary to the one asserted by the Debtors, as demonstrated by the documents attached to Rinella's Opposition.  Relying on entries in Ferris's general ledger, Rinella notes that the Debtors themselves indicate which invoices, referenced by number, each payment was to satisfy.  And the invoices the Debtors marked as paid were the oldest outstanding invoices.

   B.    **PACA Issues**

The Debtors' primary contention is that Rinella failed to strictly comply with the PACA statute and regulations, and therefore failed to preserve its trust benefits.  The

5

Debtors argue that Rinella violated PACA requirements by including a payment term on the invoices ("Net 21-days"), without first obtaining a sufficient written agreement to alter PACA's default 10-day payment provision. The Debtors contend, accordingly, that the PACA trust was never perfected. And, having failed to establish a trust, Rinella has no basis upon which to establish the fiduciary relationship necessary to establish the nondischargeablity of its claim under § 523(a)(4) of the Bankruptcy Code.

Rinella raises two arguments in rebuttal. First, Rinella says the Cover Letter and the Credit Application, taken together, constitute a sufficient written agreement under PACA. Rinella argues that, since the Cover Letter clearly states that the payment term is net 21 days, the inclusion of that term on the invoices was sufficient to strictly comply with the PACA requirements. Second, Rinella maintains that, even if the Cover Letter is insufficient to constitute a "written agreement" under PACA, inclusion of the "Net 21-days" term on the invoices does not violate the PACA statute or regulations and does not negate the PACA trust. Instead, the 21-day term should simply be deemed irrelevant; the effect of which would only be to imply PACA's default 10-day payment period upon the transactions.

The Debtors further argue that the Cover Letter and the Credit Application evidence Rinella's intention to extend long-term credit to the Debtors, not the type of short-term credit relationship required to satisfy PACA. The Debtors say that the imposition of interest rates and attorney's fees in the event of default, as well as language in the Cover Letter referencing accounts past-due by more than thirty days, indicate that Rinella contemplated a "traditional," long-term credit relationship.

Rinella counters, however, that transactions are not disqualified under PACA simply because they call for the imposition of interest and attorneys fees in the event of the

6

buyer's default.  Moreover, Rinella says, there is no evidence that would suggest Rinella

ever intended to extend payment terms beyond 21 days; indeed, the subject transaction

illustrates just the sort of short-term credit arrangement contemplated by PACA.

III.    <u>DISCUSSION</u>

    **A.    Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(c).  Either party may request summary judgment, <u>see</u>

Fed. R. Civ. P. 56(a), (b).  And, if neither party has so moved and assuming the absence

of any disputed material fact, the court may grant summary judgment *sua sponte*.  <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986); <u>Rogan v. Menino</u>, 175 F.3d 75, 79 (1st Cir.

1999); <u>Berkovitz v. HBO, Inc.</u>, 89 F.3d 24, 29 (1st Cir. 1996).  Before considering a *sua*

*sponte* grant of summary judgment, however,

> . . . two conditions precedent must be satisfied: (1) the case must be
> sufficiently advanced in terms of pretrial discovery for the summary judgment
> target to know what evidence likely can be mustered, and (2) the target must
> have received appropriate notice.

<u>Rogan</u>, 175 F.3d at 79; <u>Berkovitz</u>, 89 F.3d at 29.  In the present case, although Rinella has

not filed a cross-motion for summary judgment, <u>see</u> Fed. R. Civ. P. 56(a), the Court may

grant summary judgment for Rinella, in whole or in part, where no material issue of fact is

in dispute and the Debtors' position fails as a matter of law.  <u>See, e.g.</u>, <u>Diaz v. City of</u>

<u>Fitchburg</u>, 176 F.3d 560, 562 n.2 (1st Cir. 1999) (*sua sponte* summary judgment

appropriate for "a question of law which does not depend on the development of further

7

facts"). Discovery has now sufficiently progressed to the point where the Debtors were able to move for partial summary judgment, indicating that they are satisfied with the quantum of evidence in their possession. See Frederique-Alexandre v. Dep't of Natural & Envtl. Res., 478 F.3d 433, 439 (1st Cir. 2007). Furthermore, there is no question that the Debtors were on notice that the Court would be considering the present issues on a summary judgment basis, as the Debtors themselves have requested that consideration through their Summary Judgment Motion. See Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 431 (1st Cir. 1998).

### B.    Application of Payments

Because the PACA issues implicate, *inter alia*, the question of whether language on the invoices was sufficient to preserve Rinella's PACA trust benefits, this Court must first address the Debtors' contention that the invoices produced by Rinella do not properly form the basis for its claim. The Debtor's argument (presented with no citation to case law or other supporting material) is essentially that the payments made from February through June of 2005 should have been applied toward later, or contemporaneously issued, invoices. This argument, however, is decidedly unpersuasive.

Although neither party has specified which law it deems proper to apply to this aspect of the dispute, that omission is not material. The principles governing the application of payments to outstanding debts are the same under both New York and Massachusetts law, as well as in other jurisdictions,

> It is an established rule that where there are several outstanding debts a debtor has the primary power to direct the application of a payment. If he fails to exercise this right before or at the time of the payment, the creditor is then free to appropriate the money to any of the debts, as he chooses and without concern for the debtor's interests. Ramsey v. Warner, 97 Mass. 8,

8

13 (1867).  Spinney v. Freeman, 230 Mass. 365, 358 (1918).  See 15
Williston, Contracts § 1796 (3d ed. 1972).  When both parties fail to exercise
their respective rights and the court is thereby required to direct application,
it does so on the basis of all of the circumstances of the transaction.  Where
the equities of the situation do not require a contrary result, the rule is that
"the payments are applied by law to the liabilities of the earliest date,"
Crompton v. Pratt, 105 Mass. 255, 257 (1870) . . . .

Warren Bros. Co. v. Sentry Ins., 433 N.E.2d 1253, 1255 (Mass. App. 1982); see also

Yankee Bank for Fin. & Savings v. Task Assocs., Inc., 139 B.R. 71, 84 (N.D.N.Y. 1992)

(citing and quoting Warren Bros., 433 N.E.2d at 1255); City Coal Co. v. Noonan, 677

N.E.2d 1141, 1143 (Mass. 1997) ("The general rule is that a debtor may select which debt

the payment should be applied toward and, if the debtor makes no explicit allocation, the

creditor can make the choice."); Snide v. Larrow, 464 N.E.2d 480, 481 (N.Y. 1984) ("The

general rule is that the debtor may direct the application of his payments, but if he fails to

do so, then the creditor is permitted to apply the payments as he sees fit.   The

presumption, however, is that a payment is to be applied to that portion of the debt first

becoming due."); Restatement (Second) of Contracts, § 259(1) & cmt. a ("If the debtor has

not directed the application of his payment by the time the payment is made, the creditor

has a power to apply it himself. . . . [H]e can apply it to any matured debt or distribute it

among several matured debts and can do so to his own advantage."); Restatement

(Second) of Contracts, § 260 ("If neither the debtor nor the creditor has exercised his power

with respect to the application of a payment as between two or more matured debts . . . a

payment is applied to the earliest matured debt . . . ").[2]

─────────────────────

[2] Accord First Wis. Fin. Corp. v. Yamaguchi, 812 F.2d 370, 374 (7th Cir. 1987) ("[A] payment
is applied as the debtor directs; if the debtor does not direct, it is applied as the creditor chooses
. . .; if neither debtor nor creditor communicates a choice, the court selects an equitable method of
application.   Both the Restatement (Second) of Contracts § 260(2) and the Wisconsin cases

According to these general principles, the Court must first look to whether the Debtors directed application of payments toward any particular outstanding invoices. As alluded to above, Rinella has produced evidence that overwhelmingly supports its contention that the Debtors *intended* the relevant payments to be applied toward the oldest outstanding invoices. Ferris's general ledger clearly shows that the Debtors intended to satisfy their oldest outstanding invoices first, a conclusion bolstered by the fact that the amount of the earliest relevant payment corresponds exactly to the earliest outstanding invoices, the next payment corresponds with the amount outstanding on the next earliest, and so on. The Debtors have produced no evidence to suggest that they expressed a

---

express a preference for the ["first in, first out"] method when the court must choose."); Moxley v. Comer (In re Comer), 716 F.2d 168, 175 (3d Cir. 1983) ("The debtor has the right to make the application in the first instance, and failing to exercise it, the same right devolves upon the creditor. When no application is made by either party, the law determines how the payments are to be applied in accordance with equitable rules and principles . . . .") (quoting Woods Trust, 38 A.2d 28, 30 (Pa. 1944)); Wilson Mushroom Co. v. Annde Foods, Inc. (In re Annde Foods, Inc.), 110 B.R. 346, 349-50 (Bankr. N.D. Ill. 1989) ("[W]hen a creditor holds various accounts of a debtor, in absence of direction from the debtor, the creditor may apply payments to the best advantage of the creditor. . . . Under Illinois law where neither party indicates how the payments are to be applied, the law will apply the payments as seems just and reasonable. . . . [T]he application will ordinarily be made upon the first item due."); Weston Group, Inc. v. Hirschfeld Press, Inc., 845 P.2d 1162, 1166 (Colo. 1993) ("[G]enerally, a debtor owing more than one debt to a creditor has the right to designate the debt to which a payment shall be applied. . . . If the debtor does not direct how the payment is to be applied, then the creditor generally may apply the payment in any way that the creditor desires. . . . If neither the debtor nor the creditor exercises its right to direct application of a payment, then the payment is applied by law in order of time to the earliest matured debts."); T.Dan Kolker, Inc. v. Shure, 121 A.2d 223, 228-29 (Md. 1956) ("[T]he debtor has the right, if he so elects, to make the application of payments in the first instance and, if he omits to do so, the creditor may make the appropriation. . . . '[B]ut if there is no special appropriation by either party, *and there is a current account between them*, . . . the law makes an appropriation according to the order of the items of the account, the first item on the debit side of the account being the item discharged or reduced by the first item on the credit side.'") (quoting German Lutheran Church v. Heise, 44 Md. 453, 471-72 (Md. 1876)); Lee v. Yano, 997 P.2d 68, 75-78 (Haw. Ct. App. 2000) (collecting cases); Apple Valley Mall, LLC v. Floyd Realty Co., Inc., 1998 R.I. Super. LEXIS 2, *17-18, 1998 WL 182657, *7 (R.I. Super. March 30, 1998) ("[T]he debtor has a right to determine how payments are applied to amounts due in an account and ". . . in the absence of a direction to the contrary by a debtor, payment upon a general account may be applied by a creditor to the oldest item thereon . . . ") (quoting Harris v. Gilbert, 128 A. 11, 12 (R.I. 1925)).

10

contrary intention to Rinella at the time the payments were made, and cannot now make a *post facto* direction regarding the application of payments.  See United States v. Kirkpatrick, 22 U.S. 720, 737 (1824) ("It is certainly too late for either party to claim a right to make an appropriation, after the controversy has arisen, and *a fortiori*, at the time of trial."); Warren Bros., 433 N.E.2d at 1256 ("The debtor has no power to direct the application after the payment has been made . . . . ") (quoting 15 Williston, Contracts § 1796 (3d ed. 1972)).

In the absence of any direction from the Debtors as to the application of payments at the time they were made, Rinella was free to apply the payments to the oldest outstanding invoices.  See Annde Foods, 110 B.R. at 349; Yankee Bank, 139 B.R. at 84; City Coal Co., 677 N.E.2d at 1143; Snide v. Larrow, 464 N.E.2d at 481; Harris v. Gilbert, 128 A. at 12; Warren Bros., 433 N.E.2d at 1255; Restatement (Second) of Contracts § 259. Likewise, if the Court were to find that neither party directed a particular application of payments at the time they were made, it would hold that the Debtor's payments should be allocated to the earliest outstanding invoices, in accordance with the Restatement (Second) § 260 and applicable case law.  See Kirkpatrick, 22 U.S. at 737-38; Annde Foods, 110 B.R. at 350; Weston Group, 845 P.2d at 1166; Page v. Wilson, 28 A.2d 706, 709 (Pa. 1942); T. Dan Kolker, Inc., 121 A.2d at 229; Warren Bros., 433 N.E.2d at 1255; Restatement (Second) of Contracts § 260.[3]

---

[3] More fully, § 260 of the Restatement provides:

(1)    If neither the debtor nor the creditor has exercised his power with respect to the application of a payment as between two or more matured debts, the payment is applied to debts to which the creditor could have applied it with just regard to the interests of third persons, the debtor and the creditor.

In sum, the Debtors have presented no evidence and have cited to no case law to support their assertion that the payments should be applied to the latest outstanding invoices. The payments were properly allocated to the earliest outstanding invoices, and Rinella's reliance on the later invoices as its basis for the current debt was and is proper.

### C.    PACA

#### 1.    <u>Sufficiency of the PACA Notice</u>

The Perishable Agricultural Commodities Act of 1930 ("PACA"), as originally passed by Congress, was intended "to promote fair trading practices in the produce industry," <u>Idahoan Fresh v. Advantage Produce, Inc.</u>, 157 F.3d 197, 199 (3d Cir. 1998), by requiring buyers[4] of perishable agricultural products ("produce") to make "prompt payment" to produce sellers[5]. Under PACA, buyers who fail to make prompt payment are subject to civil liability and the revocation of their PACA license. 7 U.S.C. §§ 499e-499h. PACA

---

(2)    In applying payments under the rule stated in Subsection (1), *a payment is applied to the earliest matured debt* and ratably among debts of the same maturity . . . .

Restatement (Second) of Contracts § 260 (emphasis added).

[4] Although the PACA statute and accompanying regulations refer to "commission merchants, dealers, or brokers," <u>see, e.g.</u>, 7 U.S.C. §§ 499b(4), 499e(c); 7 C.F.R. § 46.46(c)(1), (d), this Court will simply refer to such persons as "buyers." Likewise, the Court will use the term "seller" in place of PACA's use of "supplier, seller or agent," <u>see, e.g.</u>, 7 U.S.C. § 499(e)(c); 7 C.F.R. § 46.46(c)(1).

[5] <u>See</u> 7 U.S.C. § 499b:

It shall be unlawful in or in connection with any transaction in interstate or foreign commerce:
. . .

(4) For any commission merchant, dealer, or broker. . . to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had . . . or to fail to maintain the trust as required under [§ 499e(c)]. . . .

leaves the responsibility for defining "prompt payment" to the Secretary of the United States Department of Agriculture (the "USDA"); under the USDA's regulations (the "Regulations" or "PACA Regulations"), payment is generally due within 10 days after receipt of shipment, 7 C.F.R. §§ 46.2(aa), although sellers and buyers of produce can also "elect to use different times of payment." 7 C.F.R. § 46.2(aa)(11).[6]

Recognizing that the consequences for failure to promptly pay were insufficient to protect sellers in all instances, 7 U.S.C. § 499e(c)(1); Hiller Cranberry Prods., Inc. v. Koplovsky, 165 F.3d 1, 6 (1st Cir. 1999), Congress amended PACA in 1984, creating a statutory trust as an additional protection against buyers' failure to make prompt payment.[7]

---

[6] The Regulations provide, in relevant part:

(aa) *Full payment promptly* is the term used in the Act in specifying the period of time for making payment without committing a violation of the Act. "Full payment promptly," for the purpose of determining violations of the Act, means:
. . .
(5) Payment for produce purchased by a buyer, within 10 days after the day on which the produce is accepted;
. . .

(11) Parties who elect to use different times of payment than those set forth in . . . this section must reduce their agreement to writing before entering into the transaction and maintain a copy of the agreement in their records. If they have so agreed, then payment within the agreed upon time shall constitute "full payment promptly": *Provided*, That the party claiming the existence of such an agreement for time of payment shall have the burden of proving it.

7 C.F.R. § 46.2(aa).

[7] See 7 U.S.C. § 499e(c):

Perishable agricultural commodities received by a [buyer] in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such [buyer] in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been

Under the 1984 provision, a buyer's produce, products derived from that produce, and the proceeds gained therefrom are held in a non-segregated, floating trust for the benefit of unpaid suppliers who have met the applicable statutory requirements.

<u>Idahoan Fresh</u>, 157 F.3d at 199.  If the seller fails to comply with those "applicable statutory requirements," the PACA trust will not be perfected, and the seller must rely on non-trust-related provisions to assert its claim for non-payment.

Prior to 1995, in order to preserve PACA trust benefits, a seller was required to give written notice of its intent to preserve those benefits within thirty days after the time for making payment had expired.  7 U.S.C. § 499e(c)(3).[8]  Though seemingly straight-forward, this provision underlaid considerable PACA litigation, much of it involving disputes as to when payment was due, as the time for giving written notice sufficient to preserve PACA

---

received by such unpaid suppliers, sellers, or agents.

<u>See also</u> 7 C.F.R. § 46.46(b) & (c):

(b) *Trust assets.* The trust is made up of perishable agricultural commodities received in all transactions, all inventories of food or other products derived from such perishable agricultural commodities and food or products derived therefrom. Trust assets are to be preserrved as a nonsegregated "floating" trust. Commingling of trust assets is contemplated.

(c) *Trust benefits.* (1) When a seller, supplier or agent who has met the eligibility requirements . . . . transfers ownership, possession, or control of goods to a [buyer], it automatically becomes eligible to participate in the trust. Participants who preserve their rights to benefits . . . remain beneficiaries until they are paid in full.

[8] Section 499e(c)(3) provides:

The unpaid [seller] shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the [buyer] within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary [of Agriculture], (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time [seller] has received notice that the payment instrument promptly presented for payment has been dishonored. . . .

trust benefits was dependent on the length of the payment period, whether it be 10 days

as provided by the PACA regulations or extended pursuant to a written agreement between

the parties.

Those temporal disputes have been somewhat reduced, however, by a 1995

amendment to PACA, which now allows sellers to forego written notice upon default and

to preserve PACA trust benefits by including the language provided by § 499e(c)(4) on

billing statements or invoices.[9]  Inclusion of this language is not enough, however.  In order

to preserve PACA benefits by including this specified notice, sellers must also (1) be

---

[9] Pursuant to § 499e(c)(4),

. . . A licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph (3) and contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received."

7 U.S.C. § 499e(c)(4).  Likewise, under the PACA Regulations, 7 C.F.R. § 46.46(f)(3),

. . . Licensees may use their invoice or other billing statement to preserve trust benefits. The alternative method requires that the licensee's invoice or other billing statement, given to the debtor, contain:

(i) The statement: The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received."; and

(ii) The terms of payment if they differ from prompt payment set out in section 46.2(z) and (aa) of this part, and the parties have expressly agreed to such terms in writing before the affected transactions occur.

15

licensed under PACA, 7 U.S.C. § 499e(c)(4);[10] and (2) if the parties have expressly agreed

in writing to a payment period different than the 10-day period provided by the Regulations,

the seller must also include the terms of payment on the invoice, 7 U.S.C. §§ 499e(c)(3),

(4); 7 C.F.R. § 46.46(f)(2).

The availability of PACA trust benefits is further limited to sellers who extend *short-

term* credit.  "Congress made its intention to protect short-term payment arrangements

clear by expressly refusing to bestow trust protection upon 'any credit transaction that

extends beyond a reasonable period.'" Am. Banana Co. v. Republic Nat'l Bank of N. Y., 362

F.3d 33, 44 (2d Cir. 2004) (citing and quoting H.R. Rep. No. 98-543, at 6-7 (1983),

reprinted in 1984 U.S.C.C.A.N. 405, 410).  Thus, under the PACA Regulations,

> The *maximum time for payment* for a shipment to which a seller, supplier, or
> agent can agree and still qualify for coverage under the trust *is 30 days* after
> receipt and acceptance of the commodities . . . .

7 C.F.R. § 46.46(e)(2) (emphasis added).

Notwithstanding the 1995 amendments, however, courts still occasionally find

themselves facing cases where "the language in PACA itself does not address the

situation." Hiller Cranberry, 165 F.3d at 7.  Such is the case here.  Although the parties

have debated at length the possible consequences of Rinella's alleged failure to obtain a

written agreement regarding the payment terms, this Court must first look past their implicit

assumption that no such agreement exists and determine whether, under PACA, the

parties had a "written agreement" regarding the 21-day term.  PACA, however, despite

requiring payment terms to be included on invoices where the parties have agreed in

---

[10] There is no dispute that both Ferris and Rinella were properly licensed at all relevant
times.

16

writing to extend the term beyond 10 days, does not define the term "written agreement."

In determining what constitutes a valid written agreement under PACA, we begin by following the admonition of the First Circuit Court of Appeals, in accord with the general jurisprudential consensus, that PACA, as a remedial statute, "should be given a liberal construction in favor of promoting Congress' intended purpose." Hiller Cranberry, 165 F.3d at 6.[11]   And, the First Circuit cautioned, "construction of PACA in a strict and unbending fashion would erode the trust protections PACA was meant to provide." Id. at 7; accord Hull, 924 F.2d at 782.

With this framework in mind, this Court agrees with others that have considered the issue, and holds that writings sufficient to satisfy the statute of frauds are also sufficient to constitute a written agreement  under PACA .  "Nothing in either PACA itself or the policies that lie behind it justifies the judicial creation of a rule that can be satisfied only by a formally executed document with the word "CONTRACT" typed at the top."  Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc., 307 F.3d 666, 671 (7th Cir. 2002).  Instead,

> a careful review of the statute and relevant regulations, 7 C.F.R. §§ 46.2(aa)(11) and 46.46(f)(1), leads the court to conclude that the purpose of the writing requirement is to preclude uncertainties as to the applicable payment terms and the resulting deadline for filing a PACA notice.  Thus, the provision at issue is in the nature of a statute of frauds and serves the same purpose.

Richmond Produce Co. (In re Richmond Produce Co.), 112 B.R. 364, 374 (Bankr. N.D. Ca. 1990); see also, Patterson, 307 F.3d at 671 (quoting Richmond Produce); Idahoan Fresh,

---

[11]  See also; Hull, 924 F.2d at 782; Cont'l Fruit Co. v. Thomas J. Gatziolis & Co., 774 F. Supp. 449, 452 (N.D. Ill. 1991); Debruyn Produce Co. v. Richmond Produce Co. (In re Richmond Produce Co.), 112 B.R. 364, 372 (Bankr. N.D. Ca. 1990); but see N.P. Deoudes, Inc. v. Snyder (In re Snyder), 171 B.R. 532, 541 (Bankr. D. Md. 1994), rev'd on other grounds, 184 B.R. 473 (D. Md. 1995); In re John DeFrancesco, 114 B.R. at 338.

157 F.3d at 202 (same); Agri-Sales, Inc. v. United Potato Co., 436 F. Supp. 2d 967, 973

(N.D. Ill. 2006) (citing Patterson); Phillips Mushroom Farms, L.P. v. Gold Star Mushroom

Co., 2004 U.S. Dist. LEXIS 5489, 2004 WL 620166 (E.D. Pa. March 29, 2004).

As set forth in the Restatement (Second) of Contracts, a writing sufficient to satisfy

the statute of frauds generally is one signed by or on behalf of the party to be charged and

(a) reasonably identifies the subject matter of the contract,

(b) is sufficient to indicate that a contract with respect thereto has been made
between the parties or offered by the signer to the other party, and

(c) states with reasonable certainty the essential terms of the unperformed
promises in the contract.

Restatement (Second) of Contracts, § 131; see also, Salmon Falls Mfg. Co. v. Goddard,

55 U.S. 446, 454 (1853).  Furthermore, under the Restatement, as well as both New York

and Massachusetts law, "a written memorandum 'may consist of several writings,'" although

"only one of several writings need be signed if 'the writings in the circumstances clearly

indicate that they relate to the same transaction.'" In re Rolfe, 710 F.2d 1 (1st Cir. 1983)

(citing Clark v. Olejnik, 133 N.E. 197 (Mass. 1921); Freeland v. Ritz, 28 N.E. 226 (Mass

1891); Salmon Falls Mfg.; Restatement (Second) of Contracts § 132; see also, Crabtree

v. Elizabeth Arden Sales Corp., 110 N.E.2d 551, 554 (N.Y. 1953) ("signed and unsigned

writings [may] be read together, provided that they clearly refer to the same subject matter

or transaction.").

Here, the Cover Letter and the Credit Application satisfy those requirements. Taken

together, the documents clearly evidence the parties' intention to agree on the terms by

which Rinella will sell produce to Ferris on credit, and also expressly state those terms,

including the 21-day payment period.    There is no question but that the documents refer

18

to the same subject matter, as the Cover Letter directs the Debtors to "fill out the enclosed credit application," and expressly delineates the payment period.  The Credit Application, in turn, binds the signatory to pay invoices "according to [the] stated terms."  Thus, the Court holds that, for purposes of 7 C.F.R. § 46.46(f)(3)(ii), the parties had a written agreement to extend the payment period to a term of 21-days.

Rinella's notice was sufficient to preserve its trust benefits under the PACA statute and Regulations.  Rinella included the agreed-upon payment terms and the notice required by 7 U.S.C. § 499e(c)(4) on each of its invoices, in accordance with the statute and 7 C.F.R. § 46.46(f)(3).[12]  Accordingly, insofar as it is grounded upon the argument that the inclusion of the invoice term without a sufficient written agreement prevented Rinella from perfecting its trust rights under PACA, the Court will deny the Debtors' Summary Judgment Motion and will grant summary judgment on this issue, *sua sponte*, in favor of Rinella.

## B.    The Additional Credit Terms

Notwithstanding that they have argued the absence of a written agreement, the Debtors urge this Court to find that the Cover Letter and Credit Application show that the parties did not intend to create a short-term credit relationship.  Relying on the provisions in those documents which provide for interest and attorney's fees in the event of default, the Debtors say that the parties actually contemplated a "standard" or "traditional" long-term credit arrangement.  There is nothing in PACA, however, to suggest that such terms are at odds with statute's purpose or would imply something other than the type of credit relationship to which the PACA provisions were meant to apply.  Indeed, as other courts

---

[12] Given that Rinella included this statutory language, it is irrelevant whether the Written Notice itself was timely and sufficient to preserve trust benefits under 7 U.S.C. § 499e(c)(3).

have overwhelmingly concluded, such contract terms were squarely within the contemplation of Congress when it drafted PACA. See H.R. Rep. No. 93-853 (1984), reprinted in 1984 U.S.C.C.A.N. 405 (the PACA trust provision "does not, in any way, interfere with the ability of the seller-supplier, and buyer-receiver, to set contract terms"); see also Country Best v. Christopher Ranch, LLC, 361 F.3d 629, 632-33 (11th Cir. 2004); Middle Mountain Land & Produce, Inc. v. Sound Commodities, Inc., 307 F.3d 1220, 1223-24 (9th Cir. 2002); Cont'l Food Group, LLC v. P.J. Produce, Inc., 372 F. Supp. 2d 750, 752 (S.D.N.Y. 2005); Weis-Buy Servs., Inc. v. Paglia, 307 F. Supp. 2d 682, 694-95 (W.D. Pa. 2004). This Court finds that the inclusion of those terms is evidence only that Rinella sought to "account for losses that arise from delay in payment under a contractual credit relationship," Middle Mountain, 307 F.3d at 1223-24, a credit relationship which, as previously discussed, was intended to extend no longer than 21 days.

Furthermore, the references in the Cover Letter to accounts past due by 30, 45 and 60 days actually bolster the conclusion that the parties contemplated a short-term credit arrangement. The Cover Letter states that accounts with a "balance over 30 days will be C.O.D. only . . . . over 45 days will be stop shipment . . . . over 60 days will be turned over for collections." This is not, as in Wilson Mushroom Co. v. Davis Distributors, Inc. (In re Davis Distributors, Inc.), 861 F.2d 416 (4th Cir. 1988), a situation where the buyer's account would not be considered to be contractually in default until after passage of the 30-day maximum imposed by PACA.[13] Instead, the extended periods referenced in the letter

---

[13] In In re Davis Distributors, the Fourth Circuit Court of Appeals held that a seller's transactions with the buyer did not qualify for PACA trust protection, because the parties had a written agreement extending credit beyond 30 days. 861 F.3d at 419. Although the agreement purported to require the buyer to pay within 30 days, a separate provision prevented the seller from

refer to accounts *already* in default, a default for which Rinella intended to impose further conditions and consequences.

IV.    CONCLUSION

For all of the foregoing reasons, the Court rules DENIES the Debtors' Summary Judgment Motion, and *sua sponte* GRANTS Renella partial summary judgment to the extent that it finds and rules that Rinella properly perfected its trust benefits under PACA.[14] An order in conformity with this memorandum shall issue forthwith.

By the Court,

Dated: April 12, 2007                    Henry J. Boroff
                                         United States Bankruptcy Judge

---

treating the account as in default until the passage of 60 days. Id. at 418. Accordingly, the court concluded that the contract precluded the application of the PACA trust provisions, since it could not be "read to 'require' payment within thirty days if it explicitly postpones default *and* all of the attendant consequences for sixty days." Id. at 419.

[14] Remaining to be decided is whether either or both of the Debtors are "responsibly connected" to Ferris, see 7 U.S.C. § 499a(9); 7 C.F.R. § 46.2(ff), and, if so, whether their actions with respect to the trust assets constituted "defalcation" with the meaning of § 523(a) of the Code. See Rutanen v. Baylis (In re Baylis), 313 F.3d 9, 17-21 (1st Cir. 2002).