# United States Bankruptcy Court
# District of Massachusetts
# Western Division

_____
                                            )
    In re:                                  )    Chapter 7
                                            )    Case No. 05-45130-HJB
    TIMOTHY BARTLETT and                    )
    NANCY A. BARTLETT,                      )
                                            )
                        Debtors.            )
                                            )
_____         )
                                            )
                                            )
    A.J. RINELLA & CO., INC.,               )    Adversary Proceeding
                                            )    No. 06-04045
                        Plaintiff,          )
                                            )
    v.                                      )
                                            )
                                            )
    TIMOTHY BARTLETT and                    )
    NANCY A. BARTLETT,                      )
                                            )
                        Defendants.         )
_____         )


## MEMORANDUM OF DECISION

Before the Court again, this time for final disposition, is a "Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4)" filed by A.J. Rinella & Co., Inc. ("Rinella") against Timothy Bartlett and Nancy A. Bartlett (together, the "Bartletts"). This Court earlier determined on the Bartletts' motion for summary judgment that Rinella had properly perfected and preserved its trust benefits under the Perishable Agricultural and

1

Commodities Act, 7 U.S.C. § 499a et seq. ("PACA"). See A.J. Rinella & Co., Inc. v. Bartlett (In re Bartlett), 367 B.R. 21 (Bankr. D. Mass. 2007) ("Bartlett I"). Left for determination was whether the Bartletts were "responsibly connected to Ferris [their company and the buyer of the goods] and, if so, whether their actions with respect to the trust assets constituted 'defalcation'" under § 523(a)(4). Id. at 33 n.14 (citing 7 U.S.C. § 499a(9); 7 C.F.R. § 46.2(ff); and Rutanen v. Baylis (In re Baylis), 313 F.3d 9, 17-21 (1st Cir. 2002)). Now with the benefit of an evidentiary hearing on these two remaining issues, this Court addresses both.[1]

## I. **FACTS AND TRAVEL OF THE CASE**

Two witnesses testified at trial - Anthony Rinella, the vice president, treasurer and secretary of Rinella, and Nancy A. Bartlett, co-owner of M. Ferris & Sons ("Ferris") and co-debtor.[2] The following constitute the Court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. P. 7052, based on Mr. Rinella's and Ms. Bartlett's testimony during their respective direct and cross-examination, the facts to which the parties stipulated and the exhibits admitted into the record.

---

[1] Rinella subsequently sought summary judgment on the remaining issues. At a hearing held on February 6, 2008, this Court ruled that the failure to pay a PACA claim does not, by itself, consitute defalcation under § 523(a)(4) and that the reasoning of the First Circuit in the case of In re Baylis, 313 F.3d 9 (1st Cir. 2002), further discussed below, controlled instead. Accordingly, the motion for summary judgment was denied inasmuch as the Court could not, without the benefit of trial, determine either whether the Bartletts' failure to pay the PACA claim constituted defalcation under § 523(a)(4) or the amount, if any, which was nondischargeable as the consequence of their defalcation, if any.

[2] Timothy Bartlett did not testify at trial.

The Bartletts were, during all relevant periods, the owners and operators of Ferris, a third generation family wholesale produce business, located in North Adams, Massachusetts. In December of 2000, Ferris began purchasing produce from Rinella, a wholesale distributor located in Albany, New York. Both Ferris and Rinella were licensed under PACA. The Bartletts, as owners of Ferris, completed a credit application (the "Credit Application") to which was attached a cover letter setting forth the terms of the proposed credit arrangement with Rinella. The second page of the Credit Application contained a "Personal Guarantee" to be signed by "an officer of the corporation or all partners or owner." That document was signed on December 13, 2000 by Nancy Bartlett alone.[3] However, at trial, Ms. Bartlett testified that Ferris operated as a general partnership and that she intended to sign the Credit Application and "Personal Guarantee" on behalf of both herself individually and Ferris.

---

[3] The language of the "Personal Guarantee" was as follows:

> "I/We, the undersigned, request the sale and delivery of products to the customer as stated in this application and further certify that the statements made on this application are true and correct. I/We agree that (1) all invoices will be paid according to your stated terms. (2) In the event that thereis [sic] a delinquency in payment, I/We will pay a late payment finance charge which is computed by a "periodic" rate of 1 ½ % per month which is an ANNUAL PERCENTAGE RATE OF 18 %. (3) In the event of default, I/We will pay all collection costs and attorney's fee of one third of the amount due. (4) I/We will notify you immediately of any change in ownership or operations .Notice to be in writing and to be delivered by certified mail to our office.
>
> I/We personally guarantee payment in full including all finance charges, collection costs and attorney's fees incurred as specified above, and waive any presentment, demand, protest and any other notice regarding this guarantee of payment."

Over the next five years, Ferris purchased produce from Rinella on open account. Timothy Bartlett would call in an order to Rinella and either he or another Ferris employee would drive to Albany to pick up the produce and sign the associated invoice. The bottom of each invoice contained specific language designed to preserve PACA trust benefits as set forth under PACA § 499(e)(c)(4).[4] The produce was transported back to North Adams and resold to Ferris' customers. Monies received from those sales would then be used to pay Rinella and other suppliers, as well as the Ferris operating expenses such as fuel, insurance and electricity. Nancy Bartlett, with assistance from an accountant, was responsible for maintaining Ferris' recordkeeping and payroll.[5]

Ms. Bartlett testified that she deposited monies received from the sale of produce into the Ferris checking account (the "Ferris Bank Account"). On a weekly basis, however, she would cash a check written on that account and store the cash in a strongbox at the Bartletts' residence. Those monies would be used to pay company employee salaries in

---

[4] Section 499(e)(c)(4) of the PACA statute provides:

> In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph (3) and contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received".

[5] In addition to her Ferris recordkeeping and payroll responsibilities, Ms. Bartlett was employed as an office manager at Berkshire Group Services, Inc.. Her duties as an office manager included medical billing, accounts receivable, accounts payable and payroll. Timothy Bartlett also on occasion deposited and cashed Ferris business checks. See Plaintiff's Exhibit 8 (May 7, 2005 deposit ticket and Ferris check no. 19636, cashed in the amount of $750.00).

cash, provide a cash allowance for meals purchased by drivers making the trips to Albany to pick up produce and compensate individuals who helped unload the truck once it arrived in North Adams.[6] The cash from the strongbox was also used to pay wages to Timothy Bartlett in the approximate amount of $500.00 each week (recorded as a quarterly adjustment on the Ferris General Ledger) which amount Ms. Bartlett would then transfer to their personal savings account. Those withdrawals were recorded on a subsidiary ledger (the "Cash On Hand Account").

Between December 2004 and April 13, 2005, Ferris purchased produce from Rinella totalling the sum of $63,936.60. From February 16, 2005 to June 6, 2005, Ferris paid $30,249.60 toward the outstanding balance, leaving $33,687.00 unpaid.[7] In an April 16, 2005 letter, the Bartletts informed Rinella that Ferris "was forced to close its doors" and that they would contact Rinella again in a few weeks to work out a payment schedule. After Ferris' closing, the Bartletts did indeed make three payments in the amounts of $750.00,

---

[6] Ms. Bartlett testified that $200.00 was removed from the strongbox at the beginning of each month to pay for drivers' breakfasts and that she would personally pay drivers cash for that purpose. Receipts for the meals were not collected. The same amount ($200.00) was removed at the beginning of each month to compensate neighbors and friends who assisted in unloading the trucks.

[7] Defendant's Exhibit 1 shows that Ferris made eleven (11) payments to Rinella in varying amounts between February 16, 2005 and June 6, 2005:

| Date | Amount |
|---|---|
| February 16, 2005 | $1,955.75 |
| February 23, 2005 | $3,871.35 |
| March 2, 2005 | $4,456.10 |
| March 9, 2005 | $3,756.10 |
| March 23, 2005 | $4,526.25 |
| April 1, 2005 | $3,724.05 |
| April 8, 2005 | $3,391.00 |
| May 3, 2005 | $750.00 |
| May 12, 2005 | $750.00 |
| June 6, 2005 | $300.00 |

$750.00, and $300.00, respectively, to help satisfy their outstanding debt with Rinella.  And the Bartletts did contact Rinella before filing their bankruptcy case hoping to work out an acceptable payment plan.

However, Rinella was determined to preserve its trust benefits under PACA for the unpaid produce sold to Ferris between February 14, 2005 and April 13, 2005 and, on April 18, 2005, sent Ferris a "Notice of Intent to Preserve Trust Benefits to Ferris."[8]  Rinella subsequently filed a complaint against the Bartletts in the United States District Court for the Northern District of New York to recover the unpaid account balance.  The Bartletts were served with the summons and the complaint on June 2, 2005, and, on August 1, 2005, they filed for relief in this Court under Chapter 7 of the United States Bankruptcy

---

[8] Section 499(e) of PACA states in part::

> (c)(2) Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.  Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. ...
> (c)(3) The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored.
> ...
> 7 U.S.C. §§ 499(e)(c)(2) & (3).

6

Code, 11 U.S.C. § 101 et seq., (the "Bankruptcy Code"). Rinella responded with the instant adversary proceeding seeking a determination that the debt owed to Rinella was nondischargeable pursuant to § 523(a)(4).[9]

At trial of the adversary proceeding, Plaintiff's counsel questioned Ms. Bartlett extensively on transactions contained within Ferris' General Ledger and payments made from Ferris business funds. Ms. Bartlett had difficulty, however, explaining numerous entries, including, but not limited to:

1) two write-downs from the Cash on Hand Account on June 30, 2005 in the amounts of $8,542.00 and $2,026.37, leaving the account with a zero balance;

2) an April 20, 2005 check drawn on the Ferris bank account (four days after Ferris ceased operations) made payable to cash in the amount of $300.00;

3) three cash receipts from two customers, Christina's Restaurant ($179.25 and $102.60, respectively) and Village Pizza ($450.20), recorded in the Cash On Hand Account on April 28, 2005, rather than first deposited in the Ferris Bank Account as had been standard business practice prior to closing;

4) a March 31, 2005 General Ledger entry showing an apparent $834.75 computer purchase made approximately two weeks prior to Ferris' closing;

---

[9] Section 523 of the Bankruptcy Code states, in relevant part:

> a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt –
>
>> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; ...
>
> 11 U.S.C. § 523(a)(4).

7

5) a June 1, 2005 General Ledger entry showing a $565.13 payment to North Adams Hoosac Savings to pay March withholding taxes calculated at $211.40 - an apparent overpayment of $353.73;

6) various payments made before and after the Ferris closing on account of the mortgage on the Bartletts' residence;

7) various payments made before and after the Ferris closing on a Citibank Visa personal account held in Nancy Bartlett's name; and

8) various payments made before and after the Ferris closing on an automobile loan with Greylock Federal Credit Union on a 2000 Chevrolet van, allegedly Timothy Bartlett's personal vehicle, but certainly unnecessary for business purposes after the Ferris closing.

Many times during her testimony Ms. Bartlett stated she was confused by the figures presented and unable to explain payments made, cash transferred to the strongbox, or accounting practices used. She was also questioned extensively regarding deposits made into the Bartletts' personal checking account at Hoosac Savings Bank. Ms. Bartlett testified that her and Timothy Bartlett's income came from multiple sources: Mr. Bartlett's employment with Ferris (approximately $500.00 per week), Ms. Bartlett's employment with Berkshire Group Services, Inc. (approximately $380.00 - 400.00 per week for three weeks a month and an increased amount during the fourth week), and rental income from Ferris ($400.00 per month) and from a residential tenant ($465.00 per month). She was unable, however, to explain the specific source of numerous deposits made into the Bartlett personal checking account between January and June, 2005. The deposit confusion

8

included, but was not limited to, eleven (11) deposits totaling $5,430.92, made on or after the date which Ferris ceased operations, and the following deposits: a January 3, 2005 ATM cash deposit of $1,270.00, a January 28, 2005 cash deposit of $1,035.00 of which $865.00 was attributed to "Ferris," and a March 28, 2005 deposit of $1,615.00 of which $750.00 was a check from "Ferris."

Ms. Bartlett specifically admitted during trial to using Ferris business income to pay personal and other business financial obligations that could have been used to satisfy Rinella's PACA claim. As she explained during questioning by Plaintiff's counsel:

> A. Well, the thing is is that I had lent this business almost $27,000 out of my personal line of credit towards my house, and I was hoping to raise back some of this money, not because the business closed, but because of the fact that the business closed. They still owed me $27,000, almost as much as your client. And I used my home as that line of equity.
> Q. So you chose to pay yourself before paying my client.
> A. If you want to look at it that way, I guess so, sir. If that's the way you want to interpret it.

(Trial Tr. at 101).   ...

> Q. Now, Ms. Bartlett, you've already testified a couple of times that when you made some of these payments here, indeed all these payments, you had outstanding invoices to my client.
> A. Correct.
> Q. But yet you chose to take the funds that you received from the sale of fresh produce to your customers and instead of paying my client in full, you paid all these other expenses, right?
> A. Yeah, but I believe that most of them were legitimate expenses. But that's arguable.
> Q. Understood. Some of them obviously were personal, right? The mortgage payment.
> A. But there was - - there was reasonings behind all those.
> Q. And I think you told us earlier the reason you did that is because the business owed you money - -
> A. Correct.
> Q. - - because you had infused cash in the business.
> A. Correct.

9

(Trial Tr. at 129-130).

At the conclusion of trial, Rinella requested the Court to enter a monetary judgment against the Bartletts and to rule that obligation is non-dischargeable under § 523(a)(4).

## II. POSITIONS OF THE PARTIES

Rinella maintains that the Bartletts were fiduciaries of its PACA trust assets and that both Nancy and Timothy Bartlett are liable for the Rinella debt as general partners of Ferris. Rinella argues that the Bartletts' failure to hold the proceeds from the sale of purchased produce in trust for Rinella constitutes "defalcation" while acting in a fiduciary capacity under § 523(a)(4). Rinella bases its position on its contention that the Bartletts used significant business funds to pay other debts, compensate themselves, and pre-pay business and personal obligations instead of paying Rinella as statutorily required under PACA. Rinella accuses the Bartletts with self-dealing and removing thousands of dollars from the Ferris Bank Account and Cash on Hand Account - money which could have been used to pay Rinella - and prioritizing debt repayments in such a way to pay personal obligations first.

Rinella further contends that Timothy Bartlett was not a nominal partner of Ferris and that both Timothy and Nancy Bartlett actively participated in Ferris' operations - making them both responsible for Rinella's loss. Additionally, Rinella asserts that the Bartletts actually owe $68,999.00, jointly and severally under Massachusetts partnership law, as Ms. Bartlett signed the "Personal Guarantee" on behalf of both herself and Ferris as a general partnership - making Timothy Bartlett also liable for not only the cost of the PACA assets,

but also 18% accrued interest and attorney's fees.[10] In the interest of judicial economy, Rinella requests this Court not only to find the obligations to Ferris nondischargeable, but to enter a monetary judgment against the Bartletts in the full amount requested.

Not surprisingly, the Bartletts disagree with the facts alleged and the conclusions reached by Rinella. First, they maintain that Timothy and Nancy Bartlett had separate responsibilities and obligations to Ferris. They aver that Mr. Bartlett was not a "responsible party" under the PACA statute and was, at most, a nominal partner inasmuch as it was Nancy Bartlett who made the financial decisions. They claim that Timothy Bartlett had no familiarity with the Ferris financial recordkeeping and accounting. In a similar vein, they argue that Nancy Bartlett's signature on the Rinella "Personal Guarantee" did not bind both her and Mr. Bartlett to the terms contained within - it bound her alone.

Second, while the Bartletts do not contest the Ferris obligation to Rinella and while Ms. Bartlett admitted to using Ferris business funds to pay for personal and business expenses which could have been used to satisfy Rinella's PACA claim, Ms. Bartlett contends that she was unaware of Ferris' PACA statutory obligations - she only knew that the PACA license was needed to operate the business. The Bartletts insist that there was no intention to avoid repayment. For all of the foregoing reasons, they deduce that the

---

[10] Rinella calculates the amount of attorneys fees and interest due in their motion for summary judgment. The principal balance owed was $33,687.00. Interest on the principal amount was calculated at $16,130.55 ($6,063.66 per annum x 2.6602 years between April 13, 2005 and December 10, 2007 = $16,130.55). Attorney's fees were calculated as the contractually allowed amount of one-third the principal plus interest balance ($16,605.85). Costs associated with filing the adversary proceeding and the District Court action totaled $700.00. Rinella's motion for summary judgement asked for a judgement against both Defendants in the amount of $67,123.40. At trial, Plaintiff's counsel requested judgment in the amount of $68,999.00 [principal balance plus interest ($18,058.00) plus attorneys fees ($17,250.00) plus costs ($700.00)]. (Trial Tr. at 150).

facts presented do not reach the defalcation standard set forth in Baylis, and are not precluded from discharging Rinella's debt under § 523(a)(4).

### III.   DISCUSSION

#### A.   Defalcation under § 523(a)(4) and PACA

Under the Bankruptcy Code, an individual debtor may not be discharged of any debt acquired "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). To prevail under § 523(a)(4), the challenging creditor must show that (1) the debtor acted in a fiduciary capacity; and (2) the debtor committed defalcation while acting in that capacity. In re Watford, 374 B.R. 184, 189 (Bankr. M.D.N.C. 2007); Baylis, 313 F.3d at 17 (one of the rules of § 523(a)(4) is that it applies to fiduciaries only while they are acting in a fiduciary capacity). The burden of proof rests with the creditor to establish defalcation by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991).

Federal law generally controls who is considered a fiduciary for purposes of § 523(a)(4), though state law is relevant to determining whether a trust relationship exists. Kwiat v. Doucette, 81 B.R. 184, 188 (D. Mass. 1987). A debtor will be considered a fiduciary for dischargeability purposes if the debtor is a trustee either under an express or technical trust. Id. A technical trust is one imposed by statutory or common law and will exist where the statute (1) defines the trust res, (2) identifies the trustee's fiduciary duties, and (3) imposes a trust prior to and without reference to the wrong that created the debt. Stowe v. Bologna (In re Bologna), 206 B.R. 628, 632 (Bankr. D. Mass. 1997).

12

As this Court explained in Bartlett I, the Perishable Agricultural Commodities Act of 1930 was originally passed by Congress to promote fair trading practices in the produce industry by requiring buyers of perishable agricultural products to make "prompt payment" to produce sellers. 367 B.R. at 28 (quoting Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 199 (3rd Cir. 1998))(footnotes omitted). In an effort to establish further protections for sellers, PACA was amended in 1984 to create a statutory trust in which a buyer's produce, products derived from that produce and the proceeds received therefrom, are held in a non-segregated floating trust to benefit unpaid suppliers who comply with statutory requirements. Idahoan Fresh, 157 F.3d at 199. The goal of the amendment was to protect against situations whereby a purchaser would grant other creditors a security interest in inventory and accounts receivable, leaving the supplier with nothing in the event of the buyer's bankruptcy. In re Masdea, 307 B.R. 466, 473 (Bankr. W.D.Pa. 2004)(citing Idahoan Fresh, 157 F.3d at 199).

Under PACA, a buyer's failure to make full payment promptly for received perishable agricultural commodities is unlawful. 7 U.S.C. § 499b(4). And upon timely notice of a seller's intent to preserve PACA trust benefits, "all produce-related assets are held in trust for the benefit of the unpaid seller until full payment has been received." In re Ozcelik, 267 B.R. 485, 489-490 (Bankr. D. Mass. 2001)(citations omitted). The perishable agricultural commodities "shall be held by such commission merchant, dealer or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities ... until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents." 7 U.S.C. § 499e(c)(2). Many courts have held that the statutory trust under PACA satisfies all the requirements to establish a technical trust under

13

§ 523(a)(4). See Watford, 374 B.R. at 190; Masdea, 307 B.R. at 474; In re Zois, 201 B.R. 501, 506-507 (Bankr. N.D.Ill. 1996); In re Snyder, 184 B.R. 473, 475 (Bankr. D. Md. 1995); In re Harper, 150 B.R. 416, 418-419 (Bankr. E.D.Tenn. 1993); In re Nix, 1992 WL 119143 (M.D. Ga. April 10, 1992); In re Stout, 123 B.R. 412, 415 (Bankr. W.D.Okla. 1990); but see In re McCue, 324 B.R. 389, 392-93 (Bankr. M.D.Fla. 2005)(holding that PACA fails to satisfy the first requirement as a PACA trust is a "floating trust" allowing for the commingling of trust and non-trust assets and PACA res is not segregated trust res).  This Court is in accord with the aforementioned courts which have held that the PACA statutory trust is one which satisfies the fiduciary requirement of § 523(a)(4).  As was explained by the First Circuit in the context of PACA, albeit not in the context of a determination under §523(a)(4):

> An individual who is in the position to control the trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for that tortious act. ... we find persuasive the reasoning holding a fiduciary liable for breach of trust under PACA ...a PACA trust in effect imposes liability on a trustee, whether a corporation or a controlling person of that corporation, who uses the trust assets for any purpose other than repayment of the supplier.  *This includes use of the proceeds from the sale of perishables for legitimate business expenditures, such as the payment of rent, payroll, or utilities.*

Hiller Cranberry Products, Inc. v. Koplovsky, 165 F.3d 1, 8-9 (1st Cir. 1999)(emphasis supplied).

The definition of the term "defalcation" and whether or not it occurred under any particular set of circumstances is a much murkier question.  Defalcation is not the result of every breach of fiduciary duty and it is to be measured objectively. Baylis, 313 F.3d at 17-18.  Defalcation requires "some degree of fault, closer to fraud, without the necessity of

meeting a strict specific intent requirement." Id. at 18-19.[11]  The First Circuit has provided significant guidance in explaining this interpretation:

> "We believe that defalcation lessens the threshold required from one of criminal or civil fraud to something less.  To show defalcation, a creditor need not prove that a debtor acted knowingly or willfully, in the sense of specific intent. ... a creditor must be able to show that a debtor's actions were so egregious that they come close to the level that would be required to prove fraud, embezzlement, or larceny.
> 
> A debtor fiduciary may not escape the exclusion from discharge of his debt out of defalcation by saying he had no specific intent.  As in other areas of the law, circumstances will provide the level of wrongdoing needed to constitute defalcation. ... The mental state required for defalcation is akin to the level of recklessness required for scienter.  It is more than the mere conscious taking of risk associated with the usual torts standard of recklessness.  *See Black's Law Dictionary, supra,* at 1276-77.  Instead, defalcation requires something close to a showing of extreme recklessness.
> 
> In evaluating whether there is a defalcation of a fiduciary duty, there must be a reference to the duty involved.  Of the various duties, the duty of loyalty is "[t]he most fundamental duty owed...the duty of a trustee to administer the trust solely in the interest of the beneficiaries.  2A A. Scott, *The Law of Trusts* § 170 (W.F. Fratcher ed., 4th ed. 2001).
> 
> Defalcation may be presumed from breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when that interest comes or may come into conflict with the beneficiaries' interest:
> > A trustee occupies a position in which the courts have fixed a very high and very strict standard for his conduct whenever his personal interest comes or may come into conflict with his duty to his beneficiaries.  As long as he is not acting in his own interest the standard fixed for his behavior is only that of a reasonable degree of care, skill, and caution.  But when the trustee acts in his own interest in connection with the performance of his duties as trustee, the standard of behavior becomes more rigorous.  In such a case his interest must yield to that of the beneficiaries.  2A *id.* § 170.25.

---

[11]  This standard is not the law set forth in other Circuits.  As summarized in Baylis, there are primarily three interpretive camps which have been established regarding the definition of and standard for measuring defalcation.  The first is that which allows for even an innocent mistake to constitute defalcation.  The second requires a showing of nothing more than fiduciary negligence.  The third requires at least fiduciary recklessness.  See Id. at 18 (citations omitted).  Thus, the Baylis decision pitches a fourth interpretive camp.

> As with the other fault-based exceptions, fault may be presumed from the circumstances, here a violation of the duty of loyalty."

Id. at 20-21.

Violations of the PACA statute subject buyers to civil liability and revocation of their PACA license. 7 U.S.C. §§ 499e-499h. Personal liability, however, requires only that PACA trust assets are used for some purpose other than repayment to the seller. Individuals in the position to control trust assets and who do not preserve them for the beneficiaries are personally liable. Koplovsky, 165 F.3d at 8-9. Further, under PACA, the Secretary of Agriculture has the power to prohibit employment within the perishable agricultural commodities industry for individuals who are "responsibly connected" with violators of PACA. 7 U.S.C. § 499h(b). "Responsibly connected" under PACA is defined as:

> affiliated or connected with a commission merchant, dealer, or broker as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association. A person shall not be deemed to be responsibly connected if the person demonstrates by a preponderance of the evidence that the person was not actively involved in the activities resulting in a violation of this chapter and that the person either was only nominally a partner, officer, director, or shareholder of a violating licensee or entity subject to license or was not an owner of a violating licensee or entity subject to license which was the alter ego of its owners.

7 U.S.C. § 499a(9); 7 C.F.R. § 46.2(ff).

Employing the foregoing PACA definition, this Court finds that both Nancy and Timothy Bartlett were "responsibly connected" to Ferris and had control of its trust assets. As Ms. Bartlett testified, Ferris was a general partnership run by herself and Timothy Bartlett. Federal taxes were filed on Ferris' behalf as a general partnership. Ms. Bartlett

16

testified that the accountant made specific calculations and adjustments based upon Ferris' partnership status. The Credit Application also identifies Ferris as a partnership, lists Nancy and Timothy Bartlett as the owners, and "Tim Bartlett" is specifically identified as the "contact person" on behalf of Ferris. The Court also takes note that the Bartletts' bankruptcy Schedule F lists the Rinella debt as a "joint" unsecured claim. The Bartletts provided no evidence on which this Court could base a finding that Timothy Bartlett was only nominally a partner and played no active role in the complained of PACA violation. As explained by Ms. Bartlett, Timothy Bartlett placed the orders to Rinella. He often picked up the produce from Rinella. His name or signature appears on both a deposit slip and check made out to "cash" from Ferris in the amount of $750.00. Ferris business monies were used to make payments on Mr. Bartlett's personal vehicle and the mortgage on his home. There is simply no support for the Bartletts' counsel's statements at trial that Timothy Bartlett "had no access...to the books, no responsibility for the transactions that went on."[12] Civil liability under PACA for each of the Bartletts is beyond question.

But fiduciary status and civil liability alone are not enough. The inquiry now becomes: was there defalcation under § 523(a)(4), within the guidelines provided by Baylis? Nancy and Timothy Bartlett were licensed under PACA as partners of Ferris, subjecting them to specific statutory requirements. Nancy Bartlett's insistence that she was unaware of the PACA obligations is of no import. Ignorance is not a defense to this claim. It may show no specific intent on Ms. Bartlett's part to violate the statute, but the Baylis

---

[12] The Court takes pains to emphasize that its ruling here is that Timothy Bartlett's liability to Rinella arises from his actual connection to the control of Ferris and the PACA trust assets - not any notion of "imputed liability" under § 523(a)(4), a theory whose viability the Court need not reach here.

17

defalcation test does not require that level of intention. Nor is Ms. Bartlett's blanket assertion that she and Mr. Bartlett intended to pay back Rinella's debt of special significance.

Ferris was licensed under PACA. The license makes specific reference to the statute. Each invoice, signed by a representative of Ferris, contained specific language regarding the statutory trust and provided the PACA statutory citation. The Bartletts chose to operate and maintain a business which involved significant cash payments - in and out. They did not always obtain receipts for documentation or carefully label deposits. They were, at all times in 2005, behind on payments to Rinella and, according to this Court's analysis of the General Ledger, never maintained enough money in the Ferris Bank Account to fully cover their Rinella PACA obligations. This was likely due to the decision to pay numerous other debts out of the business account, particularly their non-business obligations. And there remains the question of the disposition of thousands of dollars withdrawn from the Cash On Hand Account on June 30, 2005. The apparent disappearance of these funds with virtually little explanation from Ms. Bartlett is particularly troubling.

The Bartletts were trustees of PACA assets. They were fiduciaries and had a specific duty to preserve the PACA trust. The manner in which the Bartletts chose to operate their business goes beyond simple "confusion," "bad management" or "bad accounting" as characterized by the Bartletts' counsel. The Bartletts chose to manage Ferris' business account in a manner that failed to either safeguard sufficient funds for Rinella or permit a reasonable tracing of the proceeds of the sale of the Rinella proceeds - and used the available business funds to meet their personal obligations even after the

closing of the Ferris business, notwithstanding their fiduciary duty to Rinella. That behavior, viewed in its totality, satisfies the extreme recklessness standard suggested by Baylis for a finding of defalcation within the meaning of § 523(a)(4).

### IV.    CONCLUSION

For the foregoing reasons, the Court finds and rules that the obligations of Nancy and Timothy Bartlett to Rinella, in the amount of $33,687.00, together with interest and attorneys fees, are non-dischargeable, pursuant to § 523(a)(4).[13]

By the Court,

Dated: December 1, 2008

Henry J. Boroff
United States Bankruptcy Judge

---

[13] Rinella's request for a money judgment issued by this Court is denied. See Cambio v. Mattera (In re Cambio), 353 B.R. 30, 30-36 (1st Cir. B.A.P. 2004).